J-S28013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.R.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 333 MDA 2020 |

Appeal from the Decree Entered January 21, 2020
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  31-44-2018,
CP-31-DP-0000046-2017, CP-31-DP-0000050-2015

| | | |
|---|---|---|
| IN RE: A.L.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 334 MDA 2020 |

Appeal from the Decree Entered January 21, 2020
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  31-45-2018,
CP-31-DP-0000046-2017

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 11, 2020**

M.A.H. ("Mother") appeals separate January 21, 2020 decrees that involuntarily terminated her parental rights to her minor daughter, S.R.H., and son, A.L.H., respectively.[1] We affirm.[2]

S.R.H. was born in September 2011. Huntingdon County Children and Youth Services ("CYS") initially became involved with Mother and S.R.H. in August 2015 due to lack of supervision, hygiene, and home conditions. N.T., 6/24/19, at 24; N.T., 4/3/19, at 2-3, 10. It was reported that then-four-year-old S.R.H. was wandering the neighborhood unsupervised and climbing on the roof of the residence. In addition, there was a drug overdose in the home. N.T., 4/3/19, at 2-3. As described during the termination proceeding, "We had Agency reports of [S.R.H.] found on the roof of the home . . . , running through the [development] with no supervision, and also there was [sic] concerns of a friend who overdosed in the home of [Mother] during that time." *Id*. S.R.H. was adjudicated dependent on September 17, 2015. N.T., 4/3/19, at 36. While the court did not remove S.R.H. from Mother, the court ordered Mother to not be alone with S.R.H., and to have another party present. *Id*.

---

[1] This Court consolidated Mother's appeals *sua sponte*.

[2] By separate decrees entered October 4, 2019, the orphans' court terminated the parental rights of both S.R.H.'s father, M.D., and A.L.H.'s father, K.K. Neither father appealed the decrees or participated in the instant appeal.

at 3. S.R.H. was then placed on September 9, 2016,[3] and, since placement, has remained in the same foster home. N.T., 6/24/19, at 6, 19, 24.

A.L.H., born in September 2017, was placed in CYS custody from the hospital shortly after his birth. N.T., 6/24/19, at 6, 70-71. The agency determined that Mother was "unable to 'meet [his] basic needs[.]'" Exhibit 2 (Dr. O'Hara's, 11/21/17 report), 6/24/19, at 2, 11. A.L.H. was adjudicated dependent on October 4, 2017, and since placement, he has remained in the same foster home, except for a brief respite placement in another home between July 21, 2018 and November 4, 2018, due to a procedural hitch.[4] N.T., 6/24/19, at 7; Exhibit 2, 6/24/19, at 2.

On December 19, 2018, CYS filed petitions to involuntarily terminate Mother's parental rights to both children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held hearings on April 3, 2019, and June 24, 2019. Mother was present and represented by counsel. S.R.H. and A.L.H. were represented by both a guardian *ad litem* and counsel.[5] At the

_____

[3] S.R.H. was placed temporarily between July 8, and July 12, 2016 due to issues surrounding Mother and her paramour making a sex video. S.R.H. was returned to the home until placed again on September 9, 2016. N.T., 6/24/19 at 24.

[4] A.L.H.'s foster parent had to obtain a waiver due to the number of children in the home. N.T., 6/24/19, at 7, 10, 25.

[5] Both the guardian *ad litem* and legal counsel filed briefs in this Court that supported the termination of Mother's parental rights as promoting the children's best interests and legal interests, respectively. ***See In re Adoption of L.B.M.***, 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (stating that,

hearing, the orphans court incorporated the dependency records of both children. N.T., 4/3/19, at 1. In addition to several CYS case workers and third-party service providers, CYS presented Terry O'Hara, Ph.D., the licensed psychologist who performed several individual and interactional evaluations of Mother and the children. Mother, who did not testify on her own behalf, presented the testimony of her cousin, A.M.

On January 21, 2020, the orphans' court involuntarily terminated the parental rights of Mother pursuant to. § 2511(a)(1), (2), (5), (8), and (b). Mother filed timely separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on March 17, 2020.

Mother raises the following issues for our review:

1. Whether the orphans' court committed an abuse of discretion or error of law when it concluded that [CYS] established grounds for termination of parental rights under 23 Pa.C.S. § 2511(a)(1), (2), (5), and/or (8)?

2. Whether the orphans' court committed an abuse of discretion or error of law in concluding the termination of the bond between [S.R.H. and A.L.H.] and [M]other could be severed where the testimony of the [CYS] expert was that termination would be detrimental?

3. Whether the orphans' court mischaracterized the testimony of Dr. O'Hara such that its reliance on his testimony led to an erroneous conclusion and termination?

---

pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

- 4 -

4. Whether the orphans' court committed an abuse of discretion or error of law when it concluded that [CYS] had met the requirements for Family Finding where a maternal [cousin] was not investigated until the petition for involuntary termination was filed, and was then not seriously considered as a kinship placement option?

Mother's brief at 5-6 (suggested answers omitted).[6]

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if

_____

[6] We note with disapproval the lack of development, precision, and clarity in Mother's argument as to her first three issues and the lack of organization and delineation as required by Pa.R.A.P. 2119(a). Nevertheless, since the defects in Mother's brief do not preclude our review, we address the merits of the arguments raised therein.

the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b). ***See In re***

*B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Instantly, the certified record sustains the court's decision to terminate Mother's parental rights pursuant to § 2511(a)(2) and (b), which provide as follows:

> **(a)  General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to § 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, *supra* at 340 (internal quotation marks and citations omitted).

As to termination of Mother's parental rights pursuant to § 2511(a)(2), the orphans' court reasoned:

> The factual basis for the conclusion that the parental rights of [Mother] should be terminated with respect to each of her two (2) children is the reality that [M]other is not intellectually capable of safely caring for her children. Despite the best efforts of multiple therapists, [Mother] has made no progress toward resolving the issues that led to the finding of dependency in 2015. She is the same today as she was then and is therefore simply not able to parent these children without help. Testimony from a clinical psychologist indicated [Mother] is intellectually limited. Also, we heard that historically she has had two (2) psychiatric hospitalizations. Nonetheless, the clinician reported that she had a reluctance to pursue mental health treatment. He also testified that he saw [Mother] three (3) times over a period of seventeen (17) months and saw no progress in her ability to parent. He opined that [S.R.H. and A.L.H.] would be potentially at risk of

abuse if they were unsupervised in the custody of their mother. [M]other did not testify at hearing.

On these facts the [c]ourt found that [CYS] had established by clear, convincing and undisputed evidence conduct by [Mother] that satisfied the statutory grounds for termination set forth in [23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)].

Trial Court Opinion, 3/17/20, at 2-3.

The following review of the certified record supports the orphans' court's finding that CYS established the grounds for terminating Mother's parental rights pursuant to § 2511(a)(2). Significantly, the record reveals that Mother failed to make progress with the services provided and to remedy the conditions surrounding the removal of S.R.H. and A.L.H.

CYS caseworker, Lisa Starr, testified that her concerns as to Mother continued over the approximate three years S.R.H. had been in placement. N.T., 6/24/19, at 29. Ms. Starr indicated that, during this time, Mother had not maintained stable housing, residing in nine different residences. *Id*. at 31. While Mother obtained employment, Ms. Starr confirmed that Mother had three different jobs representing a relatively short period of the length of the case. *Id*. at 20. At the time of the June 2019 hearing, Mother had been working at McDonald's since the beginning of the year. She had previously worked at Unimart for about three months and at different employer for a week or two. *Id*. at 9, 20. Further, although Mother had been consistent with mental health treatment and medication management since she enrolled at Enlightened in November 2018, she was previously inconsistent with similar treatment at Universal Community Behavioral Health ("UCBH") and that

treatment was terminated for lack of attendance.[7] *Id*. at 30, 52. As to parenting services, Ms. Starr acknowledged that Mother completed such services; however, Mother had to redo and/or review lessons. *Id*. at 29-30. Additionally, upon completion of services, Mother's home conditions remained an issue. *Id*.

Caseworkers with Raystown Developmental Services ("RDS"), with whom CYS contracted to provide additional services, confirmed that Mother's parenting and housekeeping issues persisted, including living in squalor, feces on the toilet seat, cockroaches, and unsecured prescription bottles. N.T., 6/24/19, at 29; N.T., 4/3/19, at 11-12, 14-44. Piper Tanner, RDS family service manager, noted that Mother requires assistance to be able to care for S.R.H. and A.L.H. N.T., 4/3/19, at 9. Similarly, Tammy Lucas, a parent educator in the RDS "Proud to be a Parent" program, testified that, upon completion of the program, Mother had not made sufficient progress and that she recommended that Mother "acquire another parenting program to continue to broaden her knowledge in child development." *Id*. at 21-23. She opined that Mother would not be able to care for her children without "constant modeling and direction." *Id*. at 25. In this vein, A.M., the children's maternal cousin, described Mother as "someone who needs the support." N.T., 6/24/19, at 66.

---

[7] As reported by Dr. O'Hara, Mother had a history of depression, anxiety, and self-injury, as well as two psychiatric hospitalizations. N.T., 6/24/19, at 36-37, 48-49.

Likewise, Ms. Tanner indicated that Mother's ability to provide supervision and interact with S.R.H. and A.L.H. has decreased and that Mother becomes "tired and overwhelmed." *Id*. at 60. When asked to comment on Mother's progress, Ms. Tanner stated:

> I would say we have seen progress[,] but then we have also seen great remission in her as well. We have seen that [Mother] struggles to do things independently. She does need supports[,] but she does become angry and frustrated with supports as well at times and wants to be independent and do things on her own. We've seen a decline in her ability at times to meet [S.R.H.'s and A.L.H.]'s needs[,] knowing safety, knowing what it best practice for them. **Over the course of four years[,] I can be confident in saying we are not comfortable at this point in time with those children being returned to the home.**

*Id*. at 13 (emphasis added). As such, she testified that S.R.H. and A.L.H. are not safe if left with Mother unsupervised. *Id*. at 68.

Moreover, Dr. O'Hara, who conducted the individual and interactional evaluations with respect to Mother, first revealed that Mother exhibited intellectual deficits. N.T., 6/24/19, at 36-37. He explained that this condition "influenced her to be potentially taken advantage of by others and for her to remain in relationships which are not stable and that could be potentially abusive to her and her children." *Id*. at 51. While observing positive interactions between Mother and S.R.H. and A.L.H., Dr. O'Hara further found a lack of protective capacity on the part of Mother. *Id*. at 37-38, 47. He opined that Mother was unable to appropriately provide for her children's needs and welfare, and that there was no evidence that she would be able to

make the necessary progress in a reasonable amount of time. *Id*. at 38-39,

47-48; Exhibit 3 (Dr. O'Hara's 8/21/18 report), 6/24/19, at 13. He testified:

> . . . I eventually did not [believe] that Mother was in a position to appropriately care for a child's needs and welfare. She has not made progress over the history of the case with regard to services.[8] I didn't have any evidence that she'd increased her history of low protective capacity. I didn't have evidence she was able to make much progress when she was in a [sic] more independent from the historical support of her sister and her mother.
>
>   It was problematic from my perspective[,] given that [S.R.H. and A.L.H.] had been out of their mother's care. . . . So[,] even though [S.R.H. and A.L.H.] had been out of their mother's care for a significant amount of time, I still didn't have evidence that she had made the gains necessary to appropriately care for her children's needs and welfare.

*Id*. at 38-39. Dr. O'Hara further stated that S.R.H. and A.L.H. "would be at

risk of abuse if they were unsupervised with their mother and they would be

at further risk for housing [in]stability as well." *Id*. at 49. Dr. O'Hara

therefore advised that permanency for S.R.H. and A.L.H. was of "urgent

importance." *Id*. at 39-40. While acknowledging that S.R.H. and A.L.H. would

experience an emotional detriment as a result of termination, he concluded,

"So I think the relationship [Mother] has with [S.R.H. and A.L.H.] is

---

[8] Dr. O'Hara observed that Mother "had not been able to demonstrate a commitment to treatment, housing has been unstable, lack of income, [and] lack of progress with services." N.T., 6/24/19, at 42. Along with Mother's inconsistency with mental health treatment, Dr. O'Hara highlighted Mother's failure to complete non-offenders treatment, which he recommended due to her relationships with men who had histories of inappropriateness with children. *Id*. at 37-38, 44, 48-49.

important[,] but I don't think it's sufficient in the overall equation of what's in the best interests of [S.R.H. and A.L.H.]." *Id*. at 42.

As the certified record substantiates the orphans' court's conclusion that Mother's continued incapacity, a condition that she cannot remedy, has caused the children to be without essential parental control or subsistence necessary for their physical and mental well-being, we do not disturb it. *See In re Adoption of M.E.P.*, *supra* at 1272.

> With regard to § 2511(b), our Supreme Court has stated as follows:
>
> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, *supra* at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, ***supra*** at 1121 (internal citations omitted). Moreover, the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. ***See In re: T.S.M.***, ***supra*** at 267 ("Even the most abused of children will often harbor some positive emotion towards the abusive parent." Our High Court reasoned, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." ***Id***.

> Moreover,
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

The gravamen of Mother's argument on appeal is that the orphans' court ignored the portions of Dr. O'Hara's testimony that indicated that terminating her parental rights would be detrimental to S.R.H. and A.L.H. Mother's brief

at 14-15. She asserts that the court instead had a narrow view of its options. *Id*. at 15-16. Mother states:

> Despite all of this expert testimony, some on direct and some on cross-examination, the trial court dismissed the option of denying the petition to terminate parental rights, which would have prompted the Agency to pursue some sort of guardianship. Instead[,] the court erroneously concluded that this was not an option. While the court is correct that it was "obliged to render a decision on the merits of the petitions" and that "the Act does not confer on judges the ability to mandate agreements," the dichotomy identified by the court in setting up this dilemma does not exist: were [M]other's parental rights not terminated [S.R.H. and A.L.H.] would not return to her care; they would remain in foster placement, pending a more appropriate outcome than termination of parental rights. In short, the court's vision of what its options were was entirely too narrow.

*Id*. (citations to record omitted).

In finding that the needs and welfare of S.R.H. and A.L.H. favor terminating Mother's parental rights pursuant to § 2511(b), the orphans' court reasoned as follows:

> In this case, [Dr. O'Hara] testified that [Mother] consistently did well during the interactional phase of his three (3) evaluations. Thus, he perceived a bond and related that [S.R.H. and A.L.H.] have a positive relationship with their mother, who, he said, cares very much for her children. He opined therefore that therefore [sic] there would be some psychological detriment for [S.R.H. and A.L.H.] if [Mother]'s parental rights were terminated. Nonetheless[,] he expressed concern about unsupervised contact between [Mother] and her children.
>
> Our conclusion was that the potential risk to [S.R.H. and A.L.H.] outweighed the harm to [S.R.H. and A.L.H.] of severing the bond. Accordingly, we granted the petitions.

Trial Court Opinion, 3/17/20, at 4-5.

Upon review, we again discern no abuse of discretion. The record supports the orphans' court's finding that S.R.H.'s and A.L.H.'s developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to § 2511(b). *See T.S.M.*, *supra* at 267.

The record confirms that S.R.H. and A.L.H. have a bond with Mother. N.T., 6/24/19, at 41, 74; N.T., 4/3/19, at 8-9. Dr. O'Hara observed a positive relationship between S.R.H. and A.L.H. and Mother. He stated, "I would definitely say that [S.R.H. and A.L.H.] have a positive relationship with their mother and Mother without question very much cares for her children." N.T., 6/24/19, at 41. Similarly, Ms. Tanner noted that S.R.H. and A.L.H. show Mother affection, recognize her, and call her mom and/or mother. N.T., 4/3/19, at 8-9.

However, as indicated *infra*, although Dr. O'Hara noted that S.R.H. and A.L.H. would experience an emotional setback as a result of the termination of Mother's parental rights, he highlighted Mother's lack of progress and the lack of evidence that Mother would make and maintain the necessary gains to appropriately care for S.R.H.'s and A.L.H.'s developmental, physical, and emotional needs and welfare. As such, he determined that preserving the relationship between Mother and her children does not outweigh the best interests of the children. *Id*. at 42. Again, he stated, "So I think the relationship [Mother] has with [S.R.H. and A.L.H.] is important[,] but I don't think it's sufficient in the overall equation of what's in the best interests of [S.R.H. and A.L.H.]." *Id*. Given Mother's lack of progress, Dr. O'Hara

recommended that "permanency was of urgent importance for [S.R.H. and A.L.H.]. ***Id***. at 39-40.

Further, Mother's visitation had reverted to supervised visitation two hours per week at the RDS facility "due to [Mother] promising [S.R.H. and A.L.H.] things and not following through with." N.T., 6/24/19, at 8. Likewise, Ms. Tanner noted concerns with respect to Mother's visitation. While acknowledging that Mother displays affection, as indicated *infra*, Ms. Tanner testified that Mother's ability to provide supervision and interact with S.R.H. and A.L.H. has decreased and that Mother becomes "tired and overwhelmed." N.T., 4/3/19, at 60.

Moreover, S.R.H. has been placed in the same foster home since September 2016. N.T., 6/24/19, at 6, 19, 24. A.L.H. never resided with Mother and has been placed in the same foster home since September 2017, shortly after birth, less a brief three-month respite placement. ***Id***. at 6-7, 32-33. The evidence establishes that both children are bonded with their foster parents. CYS caseworker Lisa Starr testified about her observations of the positive interactions between S.R.H. and A.L.H. and their respective foster parents and families. ***Id***. at 25-26. Specifically, as to S.R.H., Ms. Starr described, "Whenever I've gone there right after school S.R.H. runs to the door, yells mom, look what I did today. She shows her paperwork. She gives her hugs, kisses, love you. They ask how your day was. S.R.H. will sit and tell her how her day was. They've read books together." ***Id***.

The guardian *ad litem* for S.R.H. and A.L.H. confirmed a positive relationship between S.R.H. and her foster parents. *Id*. at 73-74. The guardian *ad litem* noted that S.R.H. calls her foster parents mom and dad. *Id*. at 74-75. Further, the guardian *ad litem* spoke with A.L.H., and, while indicating that he was too young to express an opinion, noted a positive relationship with his foster family. *Id*. at 75.[9]

While Mother may profess to love S.R.H. and A.L.H., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, *supra* at 1121. At the time of the June 2019 hearing, S.R.H. had been in placement for approximately two years and nine months and A.L.H. one year and nine months, his entire life, and they are entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125.

To the extent that Mother argues that the orphans' court mischaracterized Dr. O'Hara's testimony, this claim is without merit. As we explained at length, *supra*, Dr. O'Hara testified that the emotional detriment

---

[9] We note that, as part of legal counsel's representation, counsel advised the court of S.R.H.'s preference to stay with the foster family. Counsel observed, in part, ". . .[S]he really seemed to be very well adjusted, very pleasant and indicated a very strong desire to stay in the resource parents' home." N.T., 6/24/19, at 73-74. Counsel continued, "We talked about the other foster children in the home. You know, she was telling me funny stories about things they would do and, you know, of course, there's even little petty fighting, that kind of thing, but she indicated that they all get along and she considered it to be her family and felt very comfortable there." *Id*. at 74

to the children as a result of terminating Mother's parental rights is outweighed by Mother's inability to provide the most basic parental functions. N.T., 6/24/19, at 42. Critically, while Dr. O'Hara acknowledged the benefit of ongoing contact and the idea that permanency can be achieved through placement with a family member or guardian, as opposed to adoption, he emphasized the importance of the stability of the parent. *Id*. at 42-44. Dr. O'Hara stated, in part, "There's many cases unfortunately where parents are not able to remain in a stable position and I think ongoing contact can be very detrimental to children." *Id*. at 43. Noting his concerns with Mother and her lack of progress, he made it clear that he did not find that Mother was stable. *Id*. at 42-44. Thus, he reasoned, terminating Mother's parental rights best served the developmental, physical and emotional needs and welfare of S.R.H. and A.L.H.

Finally, we examine Mother's claim as to family finding. Mother argues that the orphans' court abused its discretion when it concluded that CYS had met the requirements for family finding where a maternal cousin was neither investigated nor considered as a kinship placement option. Mother's brief at 16-20. She asserts that the cousin, who independently obtained approval as a foster parent, came forward in December 2018, but CYS did not evaluate that potential resource or permit her to contact the children because it already had determined that reunification was not possible. *Id*. at 17-19.

In rejecting Mother's claim, the orphans' court noted that it did not make a conclusion as to family finding. The court further reasoned that 23 Pa.C.S.

§ 2511 (a) and (b) do not require compliance with 67 Pa.C.S. § 3103 prior to termination of parental rights, and that 67 Pa.C.S. § 3104(a)(3) allows for discontinuance of family finding when adoption proceedings are commenced pursuant to 23 Pa.C.S. § 2101, *et seq*. Orphans' Court Opinion, 3/17/20, at 10. With this, we agree.

Mother's arguments relates to CYS's actions during the dependency proceedings, which are not before us in the instant appeal. Moreover, to the extent that the issue of family finding is justiciable in this appeal, no relief is due.

Pursuant to 67 P.S. § 3103, "Family finding shall be conducted for a child when the child is accepted for services and at least annually thereafter, until the child's involvement with the county agency is terminated or the family finding is discontinued in accordance with section 3104 (relating to discontinuance of family finding)." Instantly, CYS was in compliance with the family finding requirement and attempted to pursue those family and friends offered by the parents as potential placements for S.R.H. and A.L.H. N.T., 6/24/19, at 26-29. Critically, the maternal cousin, A.M., did not provide her name to CYS as a potential resource until approximately December 8, 2018, eleven days before the agency filed its formal petition to terminate Mother's parental rights. *Id*. at 14-15, 22, 24-25, 60-61, 71-72. As such, although CYS subsequently sent a referral to A.M., who has not contacted S.R.H. since July 2015, and has never met A.L.H., that effort was not required because the termination petition had been filed. *See* 67 P.S. § 3104(a)(3) (agency may

discontinue family finding if child is in pre-adoptive placement, and court proceedings to adopt the child have been commenced. Mother's claim fails.

For the foregoing reasons, we find that the orphans' court's did not err or abuse its discretion in terminating Mother's parental rights to S.R.H. and A.L.H. pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/11/2020